# EXHIBIT A

# SUPERIOR COURT OF WHITFIELD COUNTY
# STATE OF GEORGIA

EFILED IN OFFICE
CLERK OF SUPERIOR COURT
WHITFIELD COUNTY, GEORGIA
24CI01575
BERT POSTON
NOV 08, 2024 06:35 PM

Babs Bailey, Clerk
Whitfield County, Georgia

CIVIL ACTION NUMBER 24CI01575

ALADDIN MANUFACTURING CORPORATION
MOHAWK INDUSTRIES, INC.
MOHAWK CARPET, LLC

**PLAINTIFF**

**VS.**

3M COMPANY
EIDP, INC. F/K/A E.I. DU PONT DE NEMOURS AND COMPANY
THE CHEMOURS COMPANY
DAIKIN AMERICA, INC.

**DEFENDANTS**

**SUMMONS**

TO: 3M COMPANY

You are hereby summoned and required to file with the Clerk of said court and serve upon the Plaintiff's attorney, whose name and address is:

**Andrew Roberts**
**Alston & Bird LLP**
**1201 W Peachtree Street, #4900**
**Atlanta, Georgia 30309**

an answer to the complaint which is herewith served upon you, within 30 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

**This 8th day of November, 2024.**

Clerk of Superior Court

Babs Bailey, Clerk
Whitfield County, Georgia

EFILED IN OFFICE
CLERK OF SUPERIOR COURT
WHITFIELD COUNTY, GEORGIA
24CI01575
BERT POSTON
NOV 08, 2024 06:35 PM
Babs Bailey
Babs Bailey, Clerk
Whitfield County, Georgia

**IN THE SUPERIOR COURT OF WHITFIELD COUNTY**
**STATE OF GEORGIA**

ALADDIN MANUFACTURING CORPORATION; MOHAWK INDUSTRIES, INC.; and MOHAWK CARPET, LLC,

Plaintiffs,

v.

3M COMPANY; EIDP, INC. F/K/A E.I. DU PONT DE NEMOURS AND COMPANY; THE CHEMOURS COMPANY; and DAIKIN AMERICA, INC.,

Defendants.

Civil Action File No. ___________

**Jury Trial Requested**

## COMPLAINT

Plaintiffs Aladdin Manufacturing Corporation, Mohawk Industries, Inc., and Mohawk Carpet, LLC (collectively, "Mohawk") state the following for their Complaint against Defendants 3M Company ("3M"), EIDP, Inc. f/k/a E.I. du Pont de Nemours and Company ("DuPont") and The Chemours Company ("Chemours"), and Daikin America, Inc. ("Daikin") (collectively, "Defendants").

## INTRODUCTION

1. Mohawk is a carpet manufacturer based in Georgia.

2. Defendants are among the world's largest chemical companies. They have long manufactured a wide range of products that contain synthetic chemicals called "PFAS."

3. Defendants developed, manufactured, studied, marketed, and sold to Mohawk soil-resist carpet treatment products designed to keep carpet looking clean and fresh over time.

4. For decades, DuPont and 3M sold their carpet treatment products to Mohawk without disclosing the actual or potential presence of PFAS in their products. Daikin began selling carpet treatment products to Mohawk at a later date but it, too, initially concealed the actual or potential presence of PFAS in its products.

5. When Defendants finally disclosed to Mohawk that their carpet treatment products contained PFAS, they assured Mohawk repeatedly, and in no uncertain terms, that their products were safe. Touting their scientific expertise, they emphasized that decades of scientific study and testing proved the safety of their products.

6. Because PFAS were unregulated chemicals for which Defendants were the world's leading experts, Mohawk relied on Defendants' assurances that their products were safe. Mohawk would not have purchased and used Defendants' products if it believed otherwise.

7. But Defendants concealed from Mohawk their internal studies regarding the toxicological and environmental effects of PFAS. They concealed their concerns regarding potential effects on human health and the environment. Even when regulators and members of the public began questioning the safety of PFAS, Defendants convinced Mohawk that such concerns were baseless according to Defendants' scientists and their extensive study of PFAS.

8. Defendants also concealed the steps they took internally to address the issue of PFAS entering drinking water sources through wastewater. For example, 3M and DuPont formulated internal drinking water health and safety limits for certain PFAS chemicals as early as the 1990s.

9. Defendants knew that Mohawk's wastewater contained PFAS as a result of Mohawk's use and application of Defendants' carpet treatment chemicals—which Mohawk applied pursuant to Defendants' procedures, specifications, instructions, and oversight.

10. Defendants knew that certain Mohawk facilities sent wastewater to publicly operated treatment works. Defendants knew that conventional wastewater treatment methods are incapable of removing PFAS, and they knew that those Mohawk facilities did not have specialized PFAS removal technologies.

11. But, despite all of this, Defendants never instructed Mohawk to remove PFAS from its wastewater or to dispose of its wastewater differently.

12. Beginning in 2016, Mohawk was named as a defendant in a series of lawsuits concerning PFAS in drinking water ("Water Lawsuits"). The Water Lawsuits alleged that PFAS in the wastewater of carpet companies (including Mohawk) eventually made its way into local drinking water sources or onto other landowners' properties, requiring expensive cleanup.

13. On April 10, 2024, the U.S. Environmental Protection Agency ("EPA") for the first time established legally enforceable regulatory limits for certain PFAS chemicals in drinking water. In doing so, the EPA indicated that no detectable amount of those chemicals is safe in drinking water.

14. With a highly profitable business at stake, Defendants concealed the risks of PFAS, made false and/or misleading assurances to Mohawk regarding the safety of PFAS, and kept Mohawk in the dark in order to induce Mohawk to continue purchasing their fluoropolymer products.

15. As a result of Defendants' actions and omissions, Mohawk is now faced with numerous lawsuits, damage to its own property, and potential PFAS removal and remediation costs. To date, Mohawk has already paid over $100 million to settle certain Water Lawsuits in order to fund the construction of water treatment facilities to remove Defendants' PFAS from the drinking water of the affected communities.

16. Mohawk will necessarily continue to incur costs in the future due to pending and future litigation resulting from Defendants' conduct or the removal or remediation of PFAS on Mohawk's property or the property of others.

**JURISDICTION AND VENUE**

17. This Court has personal jurisdiction over each Defendant because each Defendant transacts business in Georgia, committed a tortious act or omission in Georgia, or committed a tortious injury in Georgia, or by virtue of its registration to do business in Georgia. Each Defendant regularly and purposefully transacted business within the State of Georgia by selling Mohawk products containing PFAS in Georgia, visiting Georgia in order to consummate and/or support that business relationship, and regularly sending communications and documents to Georgia as part of that relationship. Each Defendant also caused substantial damages to Mohawk, which were suffered in Georgia.

18. Venue is proper in Whitfield County, Georgia under O.C.G.A. § 9-10-93 because a substantial part of the business was transacted in Whitfield County; the tortious act, omission, or injury occurred in Whitfield County; and/or any nonresident Defendant was involved in the same transaction or occurrence as a resident Defendant suable in Whitfield County.

19. Venue is proper in Whitfield County, Georgia under O.C.G.A. § 14-2-510 because the contract to be enforced was made or was to be performed in Whitfield County; Mohawk's causes of action originated in Whitfield County; Defendant DuPont has an office and transacts business in Whitfield County; and/or any resident Defendant was a joint tortfeasor and involved in the same transaction or occurrence as a nonresident Defendant suable in Whitfield County.

20. Mohawk asserts no federal cause of action in this Complaint.

21. Because there is no complete diversity of citizenship among the parties, this case is not removable to federal court pursuant to 28 U.S.C. § 1332.

## PARTIES

22. Aladdin Manufacturing Corporation ("AMC") is a Delaware corporation with its principal place of business in Georgia.

23. Mohawk Industries, Inc. is a Delaware corporation with its principal place of business in Georgia.

24. Mohawk Industries, Inc. is the sole member of Mohawk Carpet, LLC.

25. AMC owns and operates carpet manufacturing facilities, including facilities in and around Dalton, Georgia. Mohawk Industries, Inc. and Mohawk Carpet, LLC are holding companies and have been named as defendants in various lawsuits concerning the manufacturing facilities owned and operated by AMC. In this Complaint, any references to actions taken by Mohawk relating to the ownership or operation of carpet manufacturing facilities are references to AMC and its corporate predecessors.

26. Defendant 3M is a Delaware corporation authorized to transact business in the State of Georgia. 3M is a chemical manufacturer that has sold products to Mohawk in Georgia.

27. Defendant DuPont is a Delaware corporation authorized to transact business in the State of Georgia. DuPont is a chemical manufacturer that maintains an office in Dalton, Georgia and has directly and indirectly sold products to Mohawk in Georgia.

28. Defendant Chemours is a Delaware corporation authorized to transact business in the State of Georgia. Chemours is a chemical manufacturer that has indirectly sold products to Mohawk in Georgia.

29. Defendant Daikin is a Delaware corporation that is not registered to transact business in the State of Georgia. Daikin is a chemical manufacturer that has sold products to Mohawk in Georgia.

## FACTUAL BACKGROUND

### PFAS

30. The allegations in this Complaint concern a family of man-made chemicals known as per- and polyfluoroalkyl substances ("PFAS"), which include perfluorooctanoic acid ("PFOA") and perfluorooctane sulfonate ("PFOS").

31. PFOA and PFOS are referred to as "C8" or "long-chain" chemistries based on their 8-carbon structure.

32. PFAS chemistries also include compounds formed by 6-carbon or 4-carbon chains, which are commonly referred to as "C6" and "C4" chemistries or, generally, "short-chain" chemistries.

33. PFAS have been referred to by some as "Forever Chemicals" because they are persistent and do not readily break down in the environment or the human body.

34. PFAS compounds were contained within and/or could degrade from the fluoropolymer products that Defendants sold to Mohawk for purposes of imparting soil-resist properties to carpet ("Fluoropolymer Products").

### Defendants Engaged in Early Research and Mass Production of PFAS

35. Defendants were and are world leaders in the fluoropolymer industry. They have repeatedly touted their scientific expertise and research and development capabilities.

36. According to 3M, "R&D is the heartbeat of 3M." 3M invested $1.9 billion in R&D in 2019 alone, it has over 8,000 scientists and researchers worldwide, and it has labs in 50 countries.

37. 3M began manufacturing fluoropolymers in the 1940s and sold products containing PFAS to a wide variety of industries for a wide variety of applications.

38. 3M's extensive knowledge of PFOS and other PFAS—including their properties, chemistry, toxicology, environmental fate, and effect on human health—exceeded that of government regulators, the public, 3M's customers, and many other chemical companies.

39. In the 1950s, DuPont also began manufacturing and selling products that contained and/or could degrade to PFAS.

40. DuPont's extensive knowledge of PFOA and other PFAS—including their properties, chemistry, toxicology, environmental fate, and effect on human health—exceeded that of government regulators, the public, DuPont's customers, and many other chemical companies.

41. Like 3M, DuPont has vast research capabilities. According to its website, "DuPont is synonymous with life-changing discoveries and scientific know-how," and with locations in 50 countries, "[a] diverse and global network of research centers, manufacturing sites and offices enable us to bring unmatched talent and expertise to our customers and partners around the world."

42. Chemours was created in 2015 when DuPont spun off its performance chemicals division to become Chemours.

43. According to Chemours, Chemours has thousands of employees and customers in approximately 120 countries, and it delivers "the power of chemistry" through "technical centers and R&D facilities that are located at a number of our production sites as well as six standalone labs across major regions of the world."

44. Daikin was established in 1991.

45. Daikin continues to market itself to this day as "the world's foremost developer and manufacturer of fluorochemical products."

46. Daikin's parent company, Daikin Industries, Ltd., had been researching fluorochemicals for decades by the time Daikin began selling Fluoropolymer Products to Mohawk, and that parent company freely shared its knowledge and information with Daikin.

47. Daikin, like DuPont and 3M, had far superior knowledge of their Fluoropolymer Products when they sold those products to Mohawk.

**Defendants Sold Fluoropolymer Products to Mohawk**

48. Mohawk has carpet manufacturing facilities located in Dalton, Georgia.

49. Mohawk and other carpet manufacturers in and around Dalton, Georgia purchased and applied Defendants' Fluoropolymer Products for the purpose of imparting soil resistance to carpet.

50. The Fluoropolymer Products that Mohawk purchased from Defendants included Scotchgard (a 3M branded product), Teflon and Stainmaster (DuPont branded products), and Unidyne (a Daikin branded product).

51. Mohawk purchased Fluoropolymer Products manufactured by 3M beginning in the 1970s.

52. Mohawk purchased Fluoropolymer Products manufactured by DuPont, and/or Fluoropolymer Products containing a fluorochemical component manufactured by DuPont, beginning in the 1970s.

53. Mohawk purchased Fluoropolymer Products manufactured by Daikin beginning in 1999.

54. Mohawk purchased Fluoropolymer Products manufactured by Chemours, and/or Fluoropolymer Products containing a fluorochemical component manufactured by Chemours, beginning in 2015.

**Defendants Concealed the Risks of PFAS from Mohawk for Decades**

55. Defendants studied the toxicological, chemical, physical, and other properties of PFAS internally—and had concerns about PFAS in wastewater—but they did not share their studies or their concerns with Mohawk.

56. In fact, after conducting years of discovery from Defendants, the plaintiffs' counsel in recent Water Lawsuits have affirmatively alleged that Defendants misled, and concealed the risks of PFAS, from Mohawk and other carpet companies.

57. For example, in one recent lawsuit, the plaintiffs alleged that "the Carpet [Companies] were misled by Chemical Manufacturers about the dangers of PFAS" and that "[t]he PFAS Manufacturing Defendants have long been aware of the persistence and toxicity of PFAS . . . [but] nonetheless knowingly and intentionally sold these chemicals to the Carpet [Companies] without adequate warnings of their dangers[.]"

58. In another recent lawsuit, the plaintiffs alleged that Defendants had "full knowledge of their products' pernicious effects and likelihood of causing pollution," but they "actively concealed and withheld [that] information from . . . [their] customers," which includes Mohawk.

**3M**

59. By 1956, 3M knew that studies showed that PFAS bind to proteins in human blood and thus bioaccumulate in the human body.

60. By 1960, 3M knew that its PFAS waste would "reach the water table and pollute domestic wells" and thus leach into groundwater and harm the environment.

61. In 1963, a 3M technical manual stated that PFAS were toxic, but 3M did not disclose this knowledge to its customers and the public.

62. By the 1970s, 3M was aware that PFOS was present in the blood of 3M workers, and blood tests of 3M workers conducted in 1978 found elevated organic fluorine levels proportional to the length of time that had been spent by employees in the production areas.

63. As a result of the blood test studies, 3M also understood that PFOS remained in the blood years after exposure: lab workers with former exposure, but no exposure for fifteen to twenty years, still had elevated organic fluorine levels above normal.

64. For decades, 3M conducted internal studies relating to the environmental, toxicological, and other properties of 3M's PFAS chemistries, including studies of rats, monkeys, fish, and water fleas.

65. For example, in 1979, one 3M study—a 90-day study of Rhesus monkeys exposed to a 3M fluorochemical surfactant—was terminated after only 20 days because of the early deaths of the monkeys in all dosage groups.

66. As another example, a 1979 internal 3M study of fish caught about 26 miles downstream of 3M's plant in Decatur, Alabama showed that fluorochemicals had bioaccumulated in fish downstream.

67. 3M also conducted various internal rat studies which showed that PFOS caused liver damage, tumor growth, and other health issues in the rats subject to the study.

68. In the late 1970s and early 1980s, 3M met with DuPont, and they discussed the presence of fluorine levels in the blood of their workers. 3M exchanged such information with DuPont while keeping Mohawk and others in the dark.

69. In 1981, 3M moved certain female employees off production lines at one of its plants based on internal research that PFAS were causing birth defects in rats.

70. In 1989, a review of mortality data for workers in 3M's chemical division found a "statistically significant excess" of deaths by "cancer of the digestive organs and peritoneum."

71. In 1997, 3M provided DuPont with a material safety data sheet ("MSDS") for a fluorochemical surfactant product that contained PFOA. The MSDS stated: "Warning: contains a chemical which can cause cancer," citing "1983 and 1993 studies conducted jointly by 3M and DuPont." 3M never included such a warning on the MSDS it provided to Mohawk.

72. 3M even implemented technology to attempt to reduce PFAS in the wastewater at its own facility, but 3M never shared any such water treatment information with Mohawk and never advised Mohawk to change its wastewater disposal practices.

73. In 1999, 3M calculated a draft Drinking Water Health Advisory (DWHA) of one part per billion lifetime exposure to PFOS. 3M did not share this internal drinking water advisory limit—or the health concerns that motivated it—with Mohawk.

74. Around the same time, 3M undertook a secret multi-city study to determine the extent of the spread of PFAS in the environment, foods, and drinking water. In 3M's multi-city study, 3M used its internal DWHA "to provide perspective in interpreting the findings in drinking water" by reference to "an acceptable level [of PFOS] in drinking water."

75. Although 3M shared its concerns with DuPont—even meeting with DuPont in 1999 to discuss removing PFOA from wastewater—3M did not share any information about its study with Mohawk.

76. Nor did 3M ever send a single letter, email, or memorandum to Mohawk directing it to alter its wastewater disposal practices.

77. Instead, a 3M document entitled "Some Probable Questions on 3M Fluorochemicals with Suggested Answers," states that, with regard to "waterborne process wastes," "since it is impractical to remove them from dilute water solutions, 3M normally recommends discharging these solutions to wastewater treatment systems."

78. 3M has been aware since at least 2001 that its own wastewater sludge contains PFAS.

79. As 3M became aware of the potential environmental and health risks of PFAS, it worked to manipulate the research available to regulators and the public.

80. In litigation, a 3M scientist admitted that 3M "stewarded information about fluorochemicals" in order to "protect the business," and a 3M Medical Director admitted that 3M had processes to ensure that scientific papers did not include "information that would appear to be contrary to 3M's business interests."

81. In March 1999, a 3M toxicologist, Dr. Richard Purdy, became so concerned with 3M's failure to inform the EPA about the environmental risks of PFAS that he copied the EPA on his letter resigning from 3M.

82. In his resignation letter, Dr. Purdy explained that he was resigning from 3M due to his "profound disappointment in 3M's handling of the environmental risks associated with the manufacture and use of perfluorinated sulfonates (PFOS)" and expressing his outrage that the company continued to "make and sell these chemicals."

83. Dr. Purdy's resignation letter further outlined "roadblocks, delays, and indecision" of 3M in stalling research into the risks of PFOS. He described his risk assessment as demonstrating that PFOS "constitutes a significant risk that should be reported to EPA under TSCA," but that 3M ultimately "decided not to submit to EPA over [Dr. Purdy's] objection."

84. According to Dr. Purdy, 3M blocked needed research on PFOS—"the most insidious pollutant since PCB"—explaining that 3M "told those of us working on the fluorochemical project not to write down our thoughts or have email discussions on issues because of how our speculation could be viewed in a legal discovery process."

85. 3M's secrecy extended to Mohawk and its other customers. An internal 3M document from 1988 reveals that 3M was "perpetuating the myth" that its PFAS are biodegradable to both customers and regulators, even though 3M knew otherwise.

86. Indeed, 3M recognized in 1995 that "obstacle No. 1" to 3M's major vision in its chemical business was the "persistence of fluorochemicals," and "environmental, health, safety and regulatory issues and trends that threaten to limit our business." Yet 3M subsequently listed among its key actions for strategic planning "[c]ontinue to maintain regulatory approval to sell PFCs [another term for PFAS] as long and as broadly as we can."

87. Beyond the secrecy, 3M took affirmative actions to conceal any risks posed by PFAS by, among other things, destroying documents discussing the risks of PFAS and instructing employees not to create a paper trail regarding their concerns about PFAS. This included instructions to mark non-privileged PFAS-related materials as protected by the attorney-client privilege and to "clean out computer of all electronic data" relating to PFOS, and it was 3M employees' practice to immediately discard any handwritten notes related to PFAS.

**DuPont and Chemours**

88. DuPont studied the toxicological effects of PFOA in rats as early as the 1960s, finding PFOA to be "highly toxic" in rats at 0.8 mg/L.

89. In 1970, a DuPont internal memo stated that its laboratory found PFOA to be "highly toxic when inhaled and moderately toxic when injected."

90. DuPont continued to study the toxicity of PFOA in rats and rabbits in the 1970s and 1980s, observing liver effects and cancer tumors.

91. In 1978, DuPont reviewed and monitored the health conditions of its workers that were potentially exposed to PFOA.

92. In 1980, DuPont found PFOA to be "toxic" and remarked that "continued exposure is not tolerable."

93. In 1981, based on information 3M shared with DuPont that showed PFOA caused birth defects in rats, DuPont removed all female employees at its Washington Works plant from areas with potentially high exposure.

94. In 1984, DuPont secretly sent employees to obtain samples of drinking water from certain communities, which showed that PFOA released from its operations contaminated local drinking water supplies.

95. In 1986, DuPont internally discussed the properties of PFAS, reporting that "C8 can be readily detected in the blood," that "animal studies have shown that C8 is moderately toxic via ingestion," and that "[c]hronic exposure to C8 can result in liver enlargement." DuPont secretly admitted that "it seems prudent to minimize the release of C8 to the environment."

96. In the 1980s, DuPont studied technical options for abating C8 chemistries (including PFOA), but DuPont never shared any such water treatment information with Mohawk and never advised Mohawk to dispose of its wastewater differently.

97. In 1991, DuPont scientists determined an internal safety limit for PFOA concentration in drinking water: one part per billion. However, DuPont did not share this internal safety limit—or the health concerns that motivated it—with Mohawk.

98. A 1992 study by DuPont found elevated cancer rates among workers.

99. By 1993, DuPont internally remarked that its PFAS C8 chemistry was "shown to be toxic and a carcinogen" expressing concern about minimizing exposure risk to its employees.

100. A 1995 internal DuPont document states: "We are concerned about the potential long-term health effects of these materials considering they all appear to have long biological half lives."

101. In 1997, 3M provided DuPont with a MSDS for a fluorochemical surfactant product that contained PFOA. The MSDS stated: "Warning: contains a chemical which can cause cancer," citing "1983 and 1993 studies conducted jointly by 3M and DuPont." Neither 3M nor DuPont ever included such a warning on the MSDS they provided to Mohawk.

102. Internally, DuPont expressed concern about potential lawsuits, stating that "toxicity issues associated with C8 exposure could turn it into the #1 DuPont torte [sic] issue."

103. In 2001, DuPont's in-house counsel handling C8 environmental matters, Bernard Reilly, wrote: "our analytical technique [for measuring C8 in water] has very poor recovery, often 25%, so any results we get should be multiplied by a factor of 4 or 5. However, that has not been the practice, so we have been telling the agencies results that surely are low. Not a pretty situation, especially since we have been telling the drinking water folks not to worry, results have been under the level we deem 'safe' of 1 ppb. We now fear we will get data from a better technique that will exceed the number we have touted as safe. Ugh."

104. In 2001, in response to a lawsuit concerning PFAS-contaminated drinking water, Reilly stated that he "sure can't blame people if they don't want to drink our chemicals." He also detailed how C8 "is very persistent in the environment" and "loves to travel in water and if ingested or breathed wants to stay in the blood, the body thinks it is food, so pulls it from the intestine, the liver dumps it back to the stomach because it can't break it down, then the intestine puts it right

back into the blood." He also predicted that the plaintiffs' lawyers would focus on the fact that C8 "kills monkeys" at certain doses.

105. In 2003, despite DuPont's knowledge of the dangers associated with C8, DuPont adopted an aggressive "PFOA (C-8) Communications Plan" to marginalize customer concerns and continue pushing its PFOA products on customers such as Mohawk. The plan had three objectives: "Reassure consumers that the products they are using are safe"; "Protect and strengthen our product brands – Teflon® and Stainmaster®"; and "Protect and strengthen the DuPont brand – our science, our core values, our products and our reputation." The plan's strategies included: "Focus on several key messages" including "There are no health effects from PFOA exposure, based on 50 years of experience and study"; "Proactively present our position and respond/provide support as needed to – Customers (segment) – letters, calls, meetings"; "do not speculate on what we don't know"; and "do not raise awareness/concerns where there are none."

106. Consistent with its "PFOA (C-8) Communications Plan," DuPont repeatedly reassured Mohawk that the Fluoropolymer Products were safe and that PFOA exposure was not harmful to human health. DuPont never shared with Mohawk its internal toxicology studies or its concerns about PFOA in drinking water.

107. Chemours was formed in 2015 when DuPont spun off its performance chemicals division—the division that purchased, used, and manufactured PFOA and other PFAS in the production of fluoropolymers.

108. Chemours therefore had the same knowledge as DuPont regarding the performance chemicals business, including the Fluoropolymer Products sold to Mohawk.

109. Chemours also never shared its internal studies and concerns with Mohawk.

**Daikin**

110. Daikin, too, conducted internal research on its Fluoropolymer Products, as did its parent company, Daikin Industries, Ltd.

111. Daikin Industries, Ltd., had been researching fluorochemicals for decades by the time Daikin began selling Fluoropolymer Products to Mohawk and had information about the toxicological, bioaccumulative, and other properties of PFAS.

112. Daikin received information from its parent company about PFAS.

113. Daikin was aware of PFAS toxicity issues when it began selling Fluoropolymer Products to Mohawk in the 1990s.

114. Daikin has been aware since at least the early 2000s that its own wastewater sludge contains PFAS.

115. Daikin did not disclose its internal studies and knowledge to Mohawk.

116. Along with DuPont and other manufacturers of fluorotelomer chemistries, Daikin was a member of the Telomer Research Program, which studied the toxicity of PFAS among other research.

117. Starting in the mid-2000s, Daikin sold Mohawk short-chain Fluoropolymer Products that were marketed as "PFOA-free." Daikin did not inform Mohawk that those products in fact contained PFOA or could degrade into PFOA.

118. According to Daikin's website, Daikin continues to market and sell Fluoropolymer Products to this day. (*See https://www.daikinchemicals.com/solutions/products /water-and-oil-repellents.html*).

**Even After Defendants Finally Disclosed the Presence of PFAS in Their Fluoropolymer Products, They Falsely Assured Mohawk That Their Products Were Safe**

119. Although 3M began selling Fluoropolymer Products to Mohawk in the 1970s, 3M did not inform Mohawk until late 1998/early 1999 that 3M's Fluoropolymer Products contained PFAS.

120. At the same time, 3M assured Mohawk that its products were safe based on decades of testing and use of 3M's products.

121. In 2000, 3M announced it was phasing out its PFOS C8 chemistry. 3M assured Mohawk that there were no adverse human health effects associated with the PFOS in Scotchgard and that it was safe to continue using Scotchgard. 3M emphasized that it was phasing out of its C8 chemistry "based on [its] principles of responsible environmental management," and explicitly ***not*** because of any risk to human health.

122. Following the withdrawal of 3M's C8 product from the market, DuPont and Daikin saw an opportunity to increase their market share: they emphasized that their Fluoropolymer Products were different from 3M's and that no PFOS was contained or used in the manufacture of their telomer products.

123. Relying on DuPont and Daikin's representations that their products were different than the 3M products that contained PFOS, Mohawk purchased Fluoropolymer Products from DuPont and Daikin that did not contain or degrade into PFOS.

124. It was not until 2003 that DuPont and Daikin disclosed that their Fluoropolymer Products contained PFOA. Before 2003, they led Mohawk to believe there was no PFOA in their Fluoropolymer Products.

125. DuPont repeatedly assured Mohawk that DuPont products containing PFOA were safe for use in manufacturing carpet. For example: "[i]n over 35 years of testing this chemistry and

the commercial products it is applied to, we have seen no safety concerns or health risks associated with our use of DuPont telomer chemistry."

126. Daikin made similar statements assuring its products' safety. And in the wake of 3M's exit from the market for C8-based products, Daikin's technical representative, Don Harris, assured the carpet industry that Daikin's products were safe.

127. DuPont and Daikin maintained that their PFOA-containing Fluoropolymer Products were safe even when concerns were raised regarding PFOA. For example, in 2006, DuPont sent a letter to Mohawk stating:

> Dear Carpet Mills & Carpet Retailers:
>
> You may have recently received a flier from the United Steel Workers (USW) containing inaccurate information about products made with DuPont fluorotelomer chemistry. The USW continues to allege that these products may be harmful to you, your customers, and consumers. **This is simply not true.**
>
> Carpets made with or using DuPont materials are safe for their intended uses.
>
> . . . PFOA is an unintended reaction byproduct that is present at trace levels in some of these products. Three federal regulatory agencies have indicated that consumers should not be concerned with products which may contain trace amounts of PFOA. Further, to date there are no human health effects known to be caused by PFOA. Based on health and toxicological studies conducted by DuPont and other researchers, DuPont believes the weight of evidence indicates that PFOA exposure does not pose a health risk to the general public.

128. Similarly, in or around 2007, Daikin gave a presentation to Mohawk stating that "[n]o cause-effect relationship has been demonstrated for PFOA and adverse human health effects" and "Daikin believes that PFOA can be used safely, and [Daikin] stand[s] behind our current Fluoropolymer and C8 product offerings."

129. Between 2000 and 2009, as regulators scrutinized long-chain PFAS (PFOS and PFOA), Defendants transitioned to selling short-chain Fluoropolymer Products, indicating that

short-chain PFAS were less persistent and better for the environment, and again, not harmful to human health.

130. The instructions, labels, and MSDSs that Defendants provided with their Fluoropolymer Products to Mohawk did not fully or sufficiently describe the health and environmental risks of their Fluoropolymer Products about which Defendants knew or should have known.

131. As an expert in carpet manufacturing—not chemical manufacturing—Mohawk relied on Defendants to provide accurate information about their Fluoropolymer Products.

132. Mohawk relied on Defendants' guarantees of safety because Defendants had unique knowledge of the Fluoropolymer Products based on their employment of thousands of chemists, toxicologists, and other scientists and experts, their research facilities and studies, and other expertise and resources that Mohawk did not have.

133. Based on Defendants' expertise, Defendants' longstanding relationships with Mohawk, and Defendants' technical support within Mohawk's own facilities, Mohawk trusted Defendants when it came to the safety and handling of their Fluoropolymer Products.

134. To this day, Defendants have not admitted that the Fluoropolymer Products that they sold to Mohawk are unsafe.

135. Through the Water Lawsuits and recent regulatory guidance and action, Mohawk has recently discovered that Defendants' assurances of safety were knowingly false.

**Defendants Directed and Controlled Mohawk's Application of Defendants' Fluoropolymer Products and Knew the Environmental Fate of Mohawk's PFAS-Containing Wastewater**

136. Defendants directed and controlled Mohawk's application of Defendants' Fluoropolymer Products to ensure conformance with their quality standards and protect their brands.

137. For example, 3M closely controlled Mohawk's use of its Scotchgard product, providing the application equipment to Mohawk free of charge, and dictating to Mohawk precisely how to apply Scotchgard and how much Scotchgard to apply.

138. DuPont also provided application equipment and required Mohawk to conform to DuPont's application methods and specifications.

139. 3M and DuPont further ensured compliance by conducting tests of Mohawk's finished carpet products.

140. In addition, 3M's, DuPont's, and Daikin's technical service representatives visited Mohawk's manufacturing facilities on a regular basis to ensure that Defendants' Fluoropolymer Products were being applied properly and to provide technical support.

141. Defendants knew that some portion of the Fluoropolymer Products did not adhere to the carpet when applied.

142. Defendants knew that, as a result, some portion of the Fluoropolymer Products were present in Mohawk's wastewater.

143. Defendants knew that Mohawk did not have technology in place to remove PFAS from its wastewater before sending the wastewater to the utility.

144. During the entire time Defendants sold Fluoropolymer Products to Mohawk, three of Mohawk's key manufacturing facilities sent their wastewater to Dalton Utilities for treatment pursuant to wastewater discharge permits. These permits never limited PFAS in any way.

145. Defendants knew that Mohawk was sending PFAS-containing wastewater to Dalton Utilities and that conventional wastewater treatment methods do not remove PFAS.

146. Defendants knew that Mohawk also used Defendants' Fluoropolymer Products at other facilities and knew that none of Mohawk's facilities had PFAS removal technology in place.

147. Defendants knew that the PFAS that was contained within or could degrade from their Fluoropolymer Products would eventually be found in Mohawk's wastewater and in the environment.

148. And yet—despite taking measures internally to address PFAS in wastewater—Defendants never instructed Mohawk to alter its wastewater disposal practices or to take any action whatsoever to remove PFAS from its wastewater.

**Regulatory Landscape**

149. In 2023, for the first time, the EPA proposed a National Primary Drinking Water Regulation to establish legally enforceable levels—called Maximum Contaminant Levels ("MCLs")—for certain PFAS in drinking water. The EPA also proposed an enforceable limit on certain short-chain PFAS compounds in the form of a combined hazard index.

150. Additionally, the EPA proposed non-enforceable Maximum Contaminant Level Goals ("MCLGs") for certain PFAS compounds. The EPA defines an MCLG as "the maximum level of a contaminant in drinking water where there is no known or anticipated negative effect on an individual's health."

151. On April 10, 2024, the EPA announced the final National Primary Drinking Water Regulation ("NPDWR") for six PFAS, establishing, for the first time, legally enforceable MCLs for PFAS in drinking water. At the same time, the EPA finalized MCLGs for the same PFAS.

152. Specifically, the EPA set four parts per trillion ("ppt") as the MCL for PFOS and for PFOA, which effectively requires no detectable amount of PFOS or PFOA in drinking water.

153. The EPA's MCLG for PFOS and for PFOA is zero.

154. For certain other PFAS compounds included in the NPDWR, the EPA set the MCLs and MCLGs at 10 ppt, still effectively requiring no detectable amount of the listed compounds. The EPA also regulated mixtures of four PFAS compounds through a hazard index.

155. The EPA stated in its concurrent press release that, "EPA expects that over many years the final rule will prevent PFAS exposure in drinking water for approximately 100 million people, prevent thousands of deaths, and reduce tens of thousands of serious PFAS-attributable illnesses."

156. The EPA's MCLs and MCLGs indicate that the EPA has concluded that even a negligible amount of PFOS, PFOA, and certain other PFAS compounds is not safe for human consumption.

**Mohawk Has Been Damaged by Defendants' Misconduct**

157. As a result of Defendants' misrepresentations and omissions regarding the Fluoropolymer Products, Mohawk purchased and applied Defendants' long-chain and short-chain products for decades, resulting in the presence of PFAS in Mohawk's wastewater.

158. Mohawk and other similarly situated carpet companies are now facing a series of lawsuits alleging that PFAS in the wastewater of carpet companies (including Mohawk) eventually made its way into local drinking water sources and/or onto other landowners' properties, requiring expensive cleanup.

159. To date, the following lawsuits have been filed against Mohawk: *City of Gadsden v. 3M Company, et al.*, No. 31-CV-2016-900676.00 (Etowah County, Alabama); *Town of Centre v. 3M Company, et al.*, No. 13-CV-2017-900049.00 (Cherokee County, Alabama); *City of Rome v. 3M Company, et al.*, No. 19CV02405 (Floyd County, Georgia); *Johnson v. 3M Company, et al.*, No. 4:20-cv-00008 (N.D. Ga.); *Shelby County and Talladega County v. 3M Company, et al.*, No.

61-CV-2023-099112.00 (Talladega County, Alabama); *Moss Land Company, LLC et al. v. City of Calhoun, Georgia, et al.*, No. 24CV73929 (Gordon County, Georgia); *Brooks, et al. v. 3M City of Calhoun, Georgia, et al.*, No. 24CV74289 (Gordon County, Georgia); and *Town of Lyerly v. 3M Company, et al.*, No. 24SCA4052 (Chattooga County, Georgia) (the "Water Lawsuits").

160. All of the Water Lawsuits except *Moss Land Company*, *Brooks*, and *Town of Lyerly* allege that the carpet companies' wastewater was sent to Dalton Utilities, a publicly operated treatment works that treated the wastewater using conventional methods and sprayed it onto the Land Application System ("LAS"), and that PFAS leached from the LAS into a river system that supplies drinking water to downstream communities, thereby threatening the communities' health and requiring them to implement expensive water treatment systems to remove the PFAS.

161. *Moss Land Company* and *Brooks* allege that the City of Calhoun similarly received PFAS-containing wastewater from the carpet companies and then applied PFAS-containing sludge to the property of certain landowners, thereby injuring the landowners and their neighbors. In addition, in *Moss Land Company* and *Brooks*, Calhoun has asserted a cross-claim alleging that the carpet companies' wastewater has contaminated Calhoun's drinking water with PFAS.

162. *Town of Lyerly* similarly alleges that Mohawk's wastewater has contaminated Lyerly's drinking water with PFAS.

163. Mohawk has paid tens of millions of dollars in settlements in connection with the Water Lawsuits.

164. In addition, the presence of PFAS on Mohawk's various properties, including PFAS on and in Mohawk's pipes and equipment, has damaged and will continue to damage Mohawk.

165. All of these damages were proximately caused by Defendants' conduct and were foreseeable to Defendants.

166. For its part, Mohawk complied with the laws, regulations, and permits governing its discharge of industrial wastewater. Mohawk reasonably relied on the expertise and assurances of Defendants. Mohawk reasonably relied on the regulators to define appropriate parameters in Mohawk's wastewater discharge permits. Mohawk reasonably relied on the water treatment facility to treat Mohawk's industrial wastewater. And Mohawk reasonably believed Fluoropolymer Products to be safe for their intended use when it applied them to its carpet.

167. Defendants—not Mohawk—should bear the costs of the settlements Mohawk has paid (or will pay) in the Water Lawsuits and/or future similar lawsuits, the damage to Mohawk's property, and any PFAS removal and remediation Mohawk pays for in the future.

168. Mohawk would never have incurred such costs but for Defendants' misrepresentations and omissions concerning the Fluoropolymer Products—products developed, researched, tested, marketed, and profitably sold by Defendants.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### Fraud

169. Mohawk repeats, re-alleges, and incorporates herein by reference each and every allegation contained in the foregoing paragraphs above, as though fully set forth herein.

170. Defendants concealed and misrepresented material information regarding environmental and health risks of the PFAS chemicals contained in their Fluoropolymer Products.

171. Defendants did so to induce Mohawk to continue purchasing their Fluoropolymer Products for as long as possible.

172. Defendants made false or materially misleading and incomplete statements to Mohawk regarding the safety and risks associated with the PFAS chemicals contained in their Fluoropolymer Products.

173. Defendants assured Mohawk that their Fluoropolymer Products were safe, not harmful, and did not pose a threat to human health.

174. Defendants knew their assurances to Mohawk were false, only partial-truths, and/or recklessly made without knowledge of the truth and with knowledge of facts that should have raised doubts about the truth of their representations.

175. Defendants were aware of, but failed to disclose, numerous facts that indicated significant environmental concerns and potential health concerns related to PFAS. Defendants concealed from Mohawk their internal studies and testing suggesting an association between certain PFAS compounds and adverse environmental or health effects.

176. Defendants also knew about the risk that, given all Defendants knew about the environmental and health risks of their Fluoropolymer Products, that the EPA would ultimately establish legally enforceable levels for PFAS in drinking water.

177. Defendants concealed material facts about the inability of conventional wastewater treatment methods to remove PFAS.

178. Defendants concealed their own concerns from Mohawk, including concerns about PFAS in wastewater.

179. Defendants concealed the fact that their Fluoropolymer Products could contaminate drinking water and create risks to the environment and human health.

180. Mohawk reasonably relied on Defendants for information regarding the safety, risks, and proper handling of the chemicals Defendants designed, researched, tested, manufactured, and then sold to Mohawk.

181. Defendants had a duty to disclose all material facts relating to the environmental, health, and regulatory risks associated with their Fluoropolymer Products based in part upon Defendants' partial disclosure of cherry-picked information. Defendants gave Mohawk assurances regarding the safety of their Fluoropolymer Products and claimed that the assurances were supported by scientific evidence.

182. Defendants had a duty to disclose facts relating to the environmental, health, and regulatory risks associated with their Fluoropolymer Products because Defendants had unique knowledge of those risks—knowledge which was never shared with Mohawk.

183. Defendants were in a superior position to know about the risks of their own products given Defendants' decades of research and development of PFAS, Defendants' investigation into the properties and effects of PFAS, and Defendants' substantial scientific capabilities and resources.

184. Defendants had a duty to disclose facts relating to the environmental, health, and regulatory risks associated with their Fluoropolymer Products because of the relationship of trust and confidence between Mohawk and each Defendant. Each relationship went well beyond that of a typical supplier/manufacturer relationship.

185. In the decades-long relationships between Mohawk and Defendants, Defendants exercised a controlling influence over Mohawk's application and handling of their Fluoropolymer Products. Among other things, they visited Mohawk's facilities regularly, exchanged confidential and proprietary information with Mohawk, advised Mohawk on technical issues, and provided

information to Mohawk and other carpet companies to support the carpet industry's response to media inquiries and other inquiries about PFAS.

186. Mohawk was not aware that the Fluoropolymer Products, when used and disposed of in accordance with industry standards, its permit terms, and Defendants' specifications, instructions, and oversight, would threaten the drinking water and/or health and safety of communities downstream of a water treatment facility.

187. If Mohawk had known that regulators and scientists would one day conclude that long-chain PFAS are unsafe at any level and short-chain PFAS may present similar risks, Mohawk would not have purchased the Fluoropolymer Products.

188. If Mohawk had known the secret testing, studies, warnings, concerns, and other information related to PFAS that Defendants withheld from Mohawk, Mohawk would not have purchased the Fluoropolymer Products.

189. As a direct, proximate, and foreseeable result of Defendants' material misrepresentations and active concealment of the risks of the PFAS compounds contained in Defendants' Fluoropolymer Products, Mohawk has suffered and will continue to suffer significant exposure and damages, including damage to its real property, the costs it incurred in redressing drinking water for communities downstream of a water treatment facility, and consequential damages.

## SECOND CAUSE OF ACTION
## Negligent Misrepresentation

190. Mohawk repeats, re-alleges, and incorporates herein by reference each and every allegation contained in the foregoing paragraphs above, as though fully set forth herein.

191. Defendants owed Mohawk a duty to take reasonable care in communicating with Mohawk about the properties, use, handling, disposal, and risks of the Fluorochemical Products.

192. As DuPont's own Medical Director wrote in 1978, companies like Defendants "should disclose health-hazard information. It should be candid and lay all the facts on table." Further, he stated: "It is the duty of every company's management to discover and reveal the unvarnished facts about health hazards. We owe it to the people who work for us and those who depend on us for products and materials."

193. Defendants negligently misrepresented material information regarding environmental and health risks of the PFAS chemicals in their Fluoropolymer Products.

194. Defendants negligently supplied false information and false assurances to Mohawk regarding the safety of their Fluoropolymer Products. Defendants assured Mohawk that their Fluoropolymer Products were safe and indicated that such assurances were supported by the science. When people or groups expressed concern that products containing PFAS may be harmful to human health, Defendants indicated that such concerns were unfounded as to the Fluoropolymer Products.

195. Defendants' internal studies and information raised and/or should have raised numerous red flags for Defendants, but they negligently disregarded those red flags.

196. Defendants were aware of, but negligently disregarded, numerous facts that indicated significant environmental and potential health concerns related to PFAS, as well as facts and concerns relating to PFAS in wastewater.

197. Defendants concealed from Mohawk their internal studies and testing suggesting an association between certain PFAS compounds and adverse environmental or health effects, while negligently assuring Mohawk that their Fluoropolymer Products were safe for Mohawk's use.

198. Mohawk reasonably relied upon Defendants' supply of false information.

199. As a direct, proximate, and foreseeable result of Defendants' misrepresentations to Mohawk—which were negligent at best—and Mohawk's reliance on those misrepresentations, Mohawk has suffered and will continue to suffer significant exposure and damages, including damage to its real property and consequential damages.

## THIRD CAUSE OF ACTION
## Contractual Indemnity

200. Mohawk repeats, re-alleges, and incorporates herein by reference each and every allegation contained in the foregoing paragraphs above, as though fully set forth herein.

201. Mohawk purchased Fluoropolymer Products from 3M, DuPont, and Daikin by sending them purchase orders.

202. Mohawk's purchase orders incorporated Mohawk's terms and conditions.

203. Mohawk's terms and conditions provided for contractual indemnity, including Mohawk's attorneys' fees and litigation expenses incurred in enforcing that contractual indemnity right.

204. For example, Mohawk's Terms and Conditions of Purchase dated December 2011 provides for contractual indemnity for damages "arising out of an actual or alleged defect in goods or any act or omission of Seller or Seller's breach of these terms and conditions."

205. Mohawk's terms and conditions governed Defendants' sale of Fluoropolymer Products to Mohawk.

206. Defendants breached the contractual indemnity provisions in the terms and conditions applicable to their respective sales to Mohawk by failing to indemnify Mohawk for the settlements paid in the Water Lawsuits.

207. Mohawk has incurred, and will continue to incur, damages as a result of Defendants' failure to indemnify Mohawk in breach of their contractual indemnity obligations.

## FOURTH CAUSE OF ACTION
## Negligence

208. Mohawk repeats, re-alleges, and incorporates herein by reference each and every allegation contained in the foregoing paragraphs above, as though fully set forth herein.

209. As chemical manufacturers, Defendants had a duty to ensure that the chemicals they made and sold were free from unreasonable risks and were adequately handled, treated, and disposed of by Defendants' customers, including Mohawk.

210. Defendants owed Mohawk a duty to take reasonable care in designing, manufacturing, researching, marketing, and selling the Fluoropolymer Products.

211. Defendants owed Mohawk a duty to take reasonable care in communicating with Mohawk about the properties, use, handling, disposal, and risks of the Fluoropolymer Products.

212. Defendants breached their duties to Mohawk by engaging in the conduct alleged above, including, but not limited to, designing and creating products with unreasonable environmental and health risks, failing to take action to mitigate those risks, expressly marketing products as safe despite knowledge of those risks, failing to disclose the risks to Mohawk, and failing to advise Mohawk on wastewater concerns and wastewater treatment associated with the Fluoropolymer Products.

213. Mohawk reasonably relied on Defendants' assurances and had a reasonable expectation that Defendants' Fluoropolymer Products, which Mohawk applied as directed, would not contaminate Mohawk's facilities, the surrounding environment, or drinking water supplies in a manner that created an unreasonable risk to the environment or potentially to human health.

214. Defendants breached their duties to Mohawk by making false, misleading, and/or incomplete statements to Mohawk regarding the safety and risks associated with the PFAS chemicals contained in their Fluoropolymer Products.

215. Defendants were aware of, but failed to disclose, numerous facts that indicated significant environmental concerns and potential health concerns related to PFAS. Defendants concealed from Mohawk their internal studies and testing suggesting an association between certain PFAS compounds and adverse environmental or health effects.

216. Defendants also knew about the risk that, given all Defendants knew about the environmental and health risks of their Fluoropolymer Products, that the EPA would ultimately establish legally enforceable levels for PFAS in drinking water.

217. Defendants concealed material facts about the inability of conventional wastewater treatment methods to remove PFAS.

218. Defendants concealed their own concerns from Mohawk, including concerns about PFAS in wastewater.

219. Defendants concealed the fact that their Fluoropolymer Products could contaminate drinking water and create risks to the environment and human health.

220. Defendants' breaches of the duties they owed to Mohawk proximately caused harm to Mohawk.

221. As a direct, proximate, and foreseeable result of Defendants' negligence, Mohawk has incurred and will continue to incur expenses, damages, and losses, including damage to its real property and consequential damages.

## FIFTH CAUSE OF ACTION
## Failure to Warn

222. Mohawk repeats, re-alleges, and incorporates herein by reference each and every allegation contained in the foregoing paragraphs above, as though fully set forth herein.

223. As chemical manufacturers with superior knowledge of the hazards of PFAS, Defendants owed Mohawk a duty to warn of the foreseeable dangers of their Fluoropolymer Products.

224. Mohawk's use of the Fluoropolymer Products and method of disposing of PFAS-containing wastewater were reasonably foreseeable, and in fact known, to Defendants.

225. Defendants knew that the application of the Fluoropolymer Products as directed by Defendants would necessarily result in a portion of the Fluoropolymer Products being present on Mohawk's equipment, in Mohawk's pipes, and otherwise on Mohawk's property.

226. Defendants knew that the application of the Fluoropolymer Products as directed by Defendants would necessarily result in a portion of the Fluoropolymer Products being present in Mohawk's wastewater.

227. Defendants knew that Mohawk's wastewater from certain facilities was sent down the sewer to the local publicly owned treatment works.

228. Defendants knew that conventional wastewater treatment methods are incapable of removing PFAS.

229. Defendants knew or should have known that the PFAS that was contained within or could degrade from the Fluoropolymer Products they sold to Mohawk would migrate into the environment, including downstream drinking water sources.

230. Defendants knew or should have known of the environmental and health risks associated with PFAS, including PFAS in wastewater, drinking water sources, and sludge, and thus had a duty to warn Mohawk of those risks.

231. Defendants also knew or should have known, given all Defendants knew about the environmental and health risks of their Fluoropolymer Products, about the risk that the EPA would ultimately establish legally enforceable levels for PFAS in drinking water.

232. Defendants were in a superior position to understand those risks.

233. Defendants failed to warn Mohawk of those risks.

234. The risks associated with PFAS were neither obvious nor known to Mohawk because Defendants fraudulently concealed those risks.

235. Mohawk reasonably relied on Defendants to make Mohawk aware of any risks associated with the Fluoropolymer Products, and Mohawk sought and received assurances about the safety of PFAS.

236. As a direct, proximate, and foreseeable result of Defendants' negligence, Mohawk has incurred and will continue to incur expenses, damages, and losses, including damage to its real property and consequential damages.

## SIXTH CAUSE OF ACTION
## Private Nuisance

237. Mohawk repeats, re-alleges, and incorporates herein by reference each and every allegation contained in the foregoing paragraphs above, as though fully set forth herein.

238. Defendants caused the creation, continuance, and/or maintenance of a private nuisance on Mohawk's property.

239. Because of their persistence and other properties, PFOS, PFOA, and other PFAS compounds have had a lasting effect at the sites where they were applied, including Mohawk's manufacturing and wastewater disposal facilities.

240. The lasting presence of PFAS in Mohawk's pipes and elsewhere on Mohawk's properties has unreasonably interfered with the use and enjoyment of Mohawk's property. It has caused and will cause inconvenience and damage to Mohawk.

241. Defendants exercised control over the nuisance because they researched, manufactured, and sold Fluoropolymer Products to Mohawk; they directed Mohawk's application of the Fluoropolymer Products; Defendants' technical representatives were routinely present in and familiar with Mohawk's manufacturing facilities; and Defendants had knowledge of wastewater treatment issues and PFAS removal technologies, and yet they never once advised Mohawk to alter its wastewater disposal practices.

242. The nuisance created on Mohawk's property by Defendants' wrongful conduct is continuing because PFAS continues to be present in Mohawk's wastewater, on Mohawk's pipes, and elsewhere on Mohawk's properties, and the nuisance is abatable and must be abated by Defendants.

243. To the extent that the nuisance is deemed to not be abatable, Mohawk is entitled to recover for harms that occurred to Mohawk within the past four years and for all prospective harms that might occur to Mohawk in the future.

244. As a direct, proximate, and foreseeable result of the private nuisance caused by Defendants, Mohawk has suffered, and will continue to suffer, damages arising from the Water Lawsuits and from the PFAS contamination of its properties, including, but not limited to, the diminished value of its properties, interference with its use and enjoyment of the properties, upset and inconvenience, and potential remediation, filtration, and/or replacement costs.

## SEVENTH CAUSE OF ACTION
## Breach of Implied Warranty of Merchantability

245. Mohawk repeats, re-alleges, and incorporates herein by reference each and every allegation contained in the foregoing paragraphs above, as though fully set forth herein.

246. Defendants are merchants because they deal in goods and have knowledge and skill peculiar to those goods involved in the transactions at issue in this lawsuit.

247. Defendants breached the implied warranty of merchantability when they sold the Fluoropolymer Products to Mohawk.

248. The Fluoropolymer Products were not fit for the ordinary purposes for which such goods were used.

249. The Fluoropolymer Products were defectively designed with PFAS that Defendants knew posed environmental, potential health, and regulatory risks and were sold without the provision of reasonable instructions or warnings regarding those risks.

250. The Fluoropolymer Products left Defendants' possession in a defective condition.

251. The defects were not discoverable by Mohawk with ordinary prudence and care.

252. Mohawk only used Fluoropolymer Products for their intended use and with Defendants' oversight, instructions, specifications, and guidance.

253. As a direct, proximate, and foreseeable result of Defendants' breach of implied warranty of merchantability, Mohawk has incurred and will continue to incur expenses, damages, and losses, including damage to its real property and consequential damages.

## EIGHTH CAUSE OF ACTION
## Breach of Implied Warranty of Fitness for a Particular Purpose

254. Mohawk repeats, re-alleges, and incorporates herein by reference each and every allegation contained in the foregoing paragraphs above, as though fully set forth herein.

255. Defendants breached the implied warranty of fitness for a particular purpose when they sold the Fluoropolymer Products to Mohawk.

256. Defendants knew the particular purpose for which the Fluoropolymer Products were to be used and applied by Mohawk.

257. Defendants knew that the application of the Fluoropolymer Products as directed by Defendants would necessarily result in a portion of the Fluoropolymer Products being present on Mohawk's equipment, in Mohawk's pipes, and otherwise on Mohawk's property.

258. Defendants knew that the application of the Fluoropolymer Products as directed by Defendants would necessarily result in a portion of the Fluoropolymer Products being present in Mohawk's wastewater.

259. Defendants knew that Mohawk's wastewater at various facilities was sent down the sewer to the local publicly owned treatment works.

260. Defendants knew that conventional wastewater treatment methods are incapable of removing PFAS.

261. Defendants knew or should have known that the PFAS that was contained within or could degrade from the Fluoropolymer Products it sold to Mohawk would migrate into the environment, including downstream drinking water sources.

262. Defendants knew or should have known of the risks inherent in the PFAS compounds that contained or could degrade from the Fluoropolymer Products rendering the Fluoropolymer Products unfit for the particular purpose for which Mohawk intended to use them.

263. Defendants also knew or should have known, given all Defendants knew about the environmental and health risks of their Fluoropolymer Products, about the risk that the EPA would ultimately establish legally enforceable levels for PFAS in drinking water.

264. Mohawk reasonably relied on Defendants' knowledge, research, expertise, and resources to ensure that Mohawk properly and safely used, handled, and disposed of the Fluoropolymer Products.

265. The fact that the Fluoropolymer Products were unfit for the particular purpose for which they were sold to Mohawk was not discoverable by ordinary prudence and care.

266. Mohawk only used Fluoropolymer Products for their intended use and with Defendants' oversight, instructions, specifications, and guidance.

267. As a direct, proximate, and foreseeable result of Defendants' breach of implied warranty of fitness for a particular purpose, Mohawk has incurred and will continue to incur expenses, damages, and losses, including damage to its real property and consequential damages.

## NINTH CAUSE OF ACTION
## Common Law Indemnity

268. Mohawk repeats, re-alleges, and incorporates herein by reference each and every allegation contained in the foregoing paragraphs above, as though fully set forth herein.

269. Under Georgia law, if the negligence of an alleged tortfeasor is passive as opposed to active, the alleged tortfeasor can seek indemnity against a party whose conduct is alleged to be the proximate, primary, or active cause of the injury.

270. The liability of the alleged tortfeasor compelled to pay damages is passive if it consists only of negative acts or omissions, such as in failing in its duty to inspect or discover a defective condition.

271. Defendants were the proximate, primary, or active cause of the injuries alleged by the plaintiffs in the Water Lawsuits.

272. The plaintiffs in the Water Lawsuits asserted negligence claims against Mohawk, among others, but Mohawk's negligence, if any, was passive, in contrast to the active negligence of Defendants.

273. Mohawk's conduct relevant to the Fluoropolymer Products was proper and reasonable. Mohawk complied with its permits and all applicable laws and regulations in using the Fluoropolymer Products and disposing of its wastewater. Mohawk applied the Fluoropolymer Products as directed by Defendants and with Defendants' oversight, including the in-person visits of Defendants' technical representatives. Mohawk reasonably relied on Defendants' assurances of safety.

274. Unlike Defendants, Mohawk does not employ toxicologists and does not perform toxicological research on the chemicals it purchases from chemical companies.

275. An action for common-law indemnity remains available under Georgia law except to the extent that Georgia's apportionment statute has supplanted the need for common-law indemnity. The apportionment statute provides: "Damages apportioned by the trier of fact as provided in this Code section shall be the liability of each person against whom they are awarded, shall not be a joint liability among the persons liable, and shall not be subject to any right of contribution." O.C.G.A. § 51-12-33(b).

276. To date, damages have never been apportioned by the trier of fact in the Water Lawsuits.

277. The *Gadsden* and *Centre* lawsuits were not subject to Georgia's apportionment statute or any other apportionment regime. They were governed by Alabama law, which follows common-law joint and several liability. The *Shelby* lawsuit is likewise governed by Alabama law and joint and several liability.

278. In the *Johnson* and *Rome* lawsuits, the plaintiffs argued that joint and several liability should apply instead of Georgia's apportionment statute because of alleged concerted action by the defendants in those lawsuits, including Mohawk. The *Rome* lawsuit was resolved without a ruling on that issue. The *Johnson* lawsuit remains pending, and, to date, there has been no ruling on that issue. The parties in *Moss Land*, *Brooks*, and *Lyerly* have not yet addressed whether joint and several liability should apply instead of Georgia's apportionment statute.

279. Under Georgia's common-law indemnity principles, Mohawk is entitled to recover from Defendants the settlement payments Mohawk has made to date in the Water Lawsuits, and any payment Mohawk makes in the future in the Water Lawsuits pursuant to a judgment or a settlement (except where the trier of fact apportions damages pursuant to Georgia's apportionment statute).

**TENTH CAUSE OF ACTION**
**Contribution**

280. Mohawk repeats, re-alleges, and incorporates herein by reference each and every allegation contained in the foregoing paragraphs above, as though fully set forth herein.

281. Mohawk is entitled to contribution from Defendants pursuant to O.C.G.A. § 51-12-32.

282. Under the common law, contribution among alleged tortfeasors is enforceable where one has paid more than his share of the common burden which all are equally bound to bear.

283. Contribution may still be enforced except as provided in Code Section 51-12-33, which provides: "Damages apportioned by the trier of fact as provided in this Code section shall be the liability of each person against whom they are awarded, shall not be a joint liability among the persons liable, and shall not be subject to any right of contribution." O.C.G.A. § 51-12-33(b).

284. Mohawk paid far more than its fair share (if it had any share at all) of the cost to settle the Water Lawsuits that have been settled to date.

285. To date, damages have never been apportioned by the trier of fact in the Water Lawsuits.

286. The *Gadsden* and *Centre* lawsuits were not subject to Georgia's apportionment statute or any other apportionment regime. They were governed by Alabama law, which follows common-law joint and several liability. The *Shelby* lawsuit is likewise governed by Alabama law and joint and several liability.

287. In the *Johnson* and *Rome* lawsuits, the plaintiffs argued that joint and several liability should apply instead of Georgia's apportionment statute because of alleged concerted action by the defendants in those lawsuits, including Mohawk. The *Rome* lawsuit was resolved without a ruling on that issue. The *Johnson* lawsuit remains pending, and, to date, there has been no ruling on that issue. The parties in *Moss Land*, *Brooks*, and *Lyerly* have not yet addressed whether joint and several liability should apply instead of Georgia's apportionment statute.

288. Mohawk is entitled to seek contribution from Defendants for the settlement payments Mohawk made in the Water Lawsuits, and any payment Mohawk makes in the future in the Water Lawsuits pursuant to a judgment or a settlement (except where the trier of fact apportions damages pursuant to Georgia's apportionment statute).

## ELEVENTH CAUSE OF ACTION
## Declaratory Judgment

289. Mohawk repeats, re-alleges, and incorporates herein by reference each and every allegation contained in the foregoing paragraphs above, as though fully set forth herein.

290. Mohawk seeks declaratory relief pursuant to O.C.G.A. § 9-4-2.

291. Mohawk seeks a declaratory judgment that Mohawk's terms and conditions govern Defendants' sale of Fluoropolymer Products to Mohawk and that Defendants must therefore indemnify Mohawk against any past or future judgments and settlement costs incurred in past, current, or future litigation arising out of Mohawk's use of Defendants' Fluoropolymer Products.

292. Mohawk also seeks a declaratory judgment that Defendants must pay for, or reimburse Mohawk for, the costs of any PFAS reduction, removal, or remediation that Mohawk is in the future required to undertake or determines to be necessary or prudent to protect property interests and/or health.

293. Mohawk's requested declaratory relief is based on an "actual controversy" concerning the parties' rights and obligations under the Mohawk terms and conditions applicable to Defendants' sale of Fluoropolymer Products to Mohawk.

294. Mohawk's requested declaratory relief is also based on an "actual controversy" concerning the parties' obligations with respect to pending and future litigation and remediation efforts, including whether due to Defendants' fraud, negligence, breaches of warranty, nuisance, and other misconduct alleged herein Defendants must pay any and all amounts required to resolve that litigation or remediate the PFAS contamination.

295. The dispute between Mohawk and Defendants presents a substantial controversy of sufficient immediacy and reality to warrant declaratory relief.

296. Mohawk is currently in a position of uncertainty and insecurity as to the rights of the parties and risks as to taking future action, including with respect to its right to recover from Defendants amounts owed in pending and future litigation and costs incurred in remediation.

297. The facts are sufficiently established such that an actual and live controversy exists between the parties and is ripe for adjudication.

**TWELFTH CAUSE OF ACTION**
**Punitive Damages and Expenses of Litigation**

298. Mohawk repeats, re-alleges, and incorporates herein by reference each and every allegation contained in the foregoing paragraphs above, as though fully set forth herein.

299. Mohawk is entitled to punitive damages under O.C.G.A. § 51-12-5.1 and litigation expenses, including attorneys' fees, under O.C.G.A. § 13-6-11.

300. In breaching their duties to Mohawk and performing the other tortious acts and omissions described above, Defendants' actions showed willful misconduct, malice, fraud, wantonness, oppression, and that entire want of care which would raise the presumption of conscious indifference to consequences.

301. Defendants knew or should have known that Mohawk would suffer significant consequences and losses as a result of Defendants' concealment, misrepresentations, and other acts and omissions relating to PFAS.

302. Defendants nevertheless marketed and sold Fluoropolymer Products to Mohawk for as long as they could, putting the profitability of their businesses ahead of the risks that were clearly foreseeable to them.

303. Punitive damages should be imposed on Defendants in an amount sufficient to punish them and deter them from repeating such wrongful conduct.

304. In breaching their duties to Mohawk and performing the other tortious acts and omissions described above, Defendants acted in bad faith and caused Mohawk unnecessary trouble and expense.

**PRAYER FOR RELIEF**

**WHEREFORE,** Mohawk prays that the court enter judgment in its favor and against Defendants and grant the following relief:

a. A declaratory judgment that Mohawk's terms and conditions govern Defendants' sale of Fluoropolymer Products to Mohawk and that Defendants must pay for, or reimburse Mohawk for, any past or future judgments and settlement costs incurred in past, current, or future litigation arising out of Mohawk's use of Defendants' Fluoropolymer Products;

b. A declaratory judgment that Defendants must reimburse Mohawk for the costs of any PFAS reduction, removal, or remediation that Mohawk is in the future required to undertake, or determines to be necessary or prudent to protect property interests or health;

c. A judgment for past, present, and future compensatory damages in such amounts as the evidence shows Mohawk to be justly entitled to recover, including but not limited to (1) the payments Mohawk made to plaintiffs to date in connection with the Water Lawsuits; (2) any costs associated with any PFAS reduction, removal, or remediation of Mohawk's property or the property of others; (3) any costs Mohawk incurs in connection with any future increase in water treatment rates as a result of efforts to upgrade facilities to ensure PFAS treatment, removal, and/or remediation; and (4) prejudgment interest;

d. A judgment for punitive damages in an amount sufficient to punish and deter Defendants pursuant to O.C.G.A. § 51-12-5.1;

e. A judgment for litigation expenses, including attorneys' fees and costs, pursuant to O.C.G.A. § 13-6-11; and

f. Such other and further relief as the Court deems equitable, proper, and just.

**JURY DEMAND**

Pursuant to O.C.G.A. § 9-11-38, Mohawk demands a trial by jury of all issues properly triable thereby.

Respectfully submitted this 8th day of November, 2024.

*/s/ Doug Scribner*
Doug Scribner
Georgia Bar No. 632755
Jason Rottner
Georgia Bar No. 678137
jason.rottner@alston.com
Jay Repko
Georgia Bar No. 301797
jay.repko@alston.com
Andrew A. Roberts
Georgia Bar No. 425333
andrew.roberts@alston.com

ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, GA 30309
Telephone: 404-881-7000

EFILED IN OFFICE
CLERK OF SUPERIOR COURT
WHITFIELD COUNTY, GEORGIA
24CI01575
BERT POSTON
NOV 08, 2024 06:35 PM
Babs Bailey, Clerk
Whitfield County, Georgia

# General Civil and Domestic Relations Case Filing Information Form

☑ Superior or ☐ State Court of Whitfield County

**For Clerk Use Only**

Date Filed 11-08-2024
MM-DD-YYYY

Case Number 24CI01575

| Plaintiff(s) | Defendant(s) |
|---|---|
| ALADDIN MANUFACTURING CORPORATION | 3M COMPANY |
| Last First Middle I. Suffix Prefix | Last First Middle I. Suffix Prefix |
| MOHAWK INDUSTRIES, INC. | EIDP, INC. F/K/A E.I. DU PONT DE NEMOURS AND C |
| Last First Middle I. Suffix Prefix | Last First Middle I. Suffix Prefix |
| MOHAWK CARPET, LLC | THE CHEMOURS COMPANY |
| Last First Middle I. Suffix Prefix | Last First Middle I. Suffix Prefix |
| | DAIKIN AMERICA, INC. |
| Last First Middle I. Suffix Prefix | Last First Middle I. Suffix Prefix |

Plaintiff's Attorney Roberts, Andrew Bar Number 425333 Self-Represented ☐

**Check one case type and, if applicable, one sub-type in one box.**

**General Civil Cases**

- ☐ Automobile Tort
- ☐ Civil Appeal
- ☐ Contract
- ☐ Contempt/Modification/Other Post-Judgment
- ☐ Garnishment
- ☐ General Tort
- ☐ Habeas Corpus
- ☐ Injunction/Mandamus/Other Writ
- ☐ Landlord/Tenant
- ☐ Medical Malpractice Tort
- ☐ Product Liability Tort
- ☐ Real Property
- ☐ Restraining Petition
- ☑ Other General Civil

**Domestic Relations Cases**

- ☐ Adoption
- ☐ Contempt
  - ☐ Non-payment of child support, medical support, or alimony
- ☐ Dissolution/Divorce/Separate Maintenance/Alimony
- ☐ Family Violence Petition
- ☐ Modification
  - ☐ Custody/Parenting Time/Visitation
- ☐ Paternity/Legitimation
- ☐ Support – IV-D
- ☐ Support – Private (non-IV-D)
- ☐ Other Domestic Relations

☐ Check if the action is related to another action(s) pending or previously pending in this court involving some or all of the same parties, subject matter, or factual issues. If so, provide a case number for each.

_______________ Case Number _______________ Case Number

☑ I hereby certify that the documents in this filing, including attachments and exhibits, satisfy the requirements for redaction of personal or confidential information in O.C.G.A. § 9-11-7.1.

☐ Is a foreign language or sign-language interpreter needed in this case? If so, provide the language(s) required.

_______________ Language(s) Required

☐ Do you or your client need any disability accommodations? If so, please describe the accommodation request.

SHERIFF'S ENTRY OF SERVICE

Civil Action No. 24CI01575

Superior Court ☒ Magistrate Court ☐
State Court ☐ Probate Court ☐
Juvenile Court ☐

Date Filed November 8, 2024

Georgia, Whitfield COUNTY

Attorney's Address

Andrew A. Roberts, Alston & Bird LLP
1201 W. Peachtree Street, Suite 4900
Atlanta, GA 30309

Aladdin Manufacturing Corp. et al.
Plaintiff

VS.

3M Company et al.
Defendant

Name and Address of Party to Served

3M Company c/o Corporation Service Co.
2 Sun Court, Suite 400
Peachtree Corners, GA 30092

Garnishee

## SHERIFF'S ENTRY OF SERVICE

**PERSONAL**

☐ I have this day served the defendant ______ personally with a copy of the within action and summons.

**NOTORIOUS**

I have this day served the defendant ______ by leaving a copy of the action and summons at his most notorious place abode in this County.

☐ Delivered same into hands of ______ described as follows: age, about ______ years; weight ______ pounds; height ______ feet and ______ inches, domiciled at the residence of defendant.

**CORPORATION**

Served the defendant 3M Company a corporation

☒ by leaving a copy of the within action and summons with Aliyah [illegible]
In charge of the office and place of doing business of said Corporation in this County.

**TACK & MAIL**

☐ I have this day served the above styled affidavit and summons on the defendant(s) by posting a copy of the same to the door of the premises designated in said affidavit and on the same day of such posting by depositing a true copy of same in the United States Mail, First Class in an envelope properly addressed to the defendant(s) at the address shown in said summons, with adequate postage affixed thereon containing notice to the defendant(s) to answer said summons at the place stated in the summons.

**NON EST**

☐ Diligent search made and defendant ______ not to be found in the jurisdiction of this Court.

This 14 day of Nov, 2024.

DEPUTY [signature]

PLAINTIFF'S COPY